WMP:JMK
F. #2014R00437

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

RICHARD ST. JULIEN,

            Defendant.

- - - - - - - - - - - - - - -X

**15M356**

**To Be Filed Under Seal**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANT

(18 U.S.C. § 1349)

EASTERN DISTRICT OF NEW YORK, SS:

ARISTOTELIS KOUGEMITROS, being duly sworn, deposes and says that he is a

Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law

and acting as such.

Upon information and belief, in or about and between August 2012 and April 2015,

within the Eastern District of New York and elsewhere, the defendant RICHARD ST. JULIEN,

together with others, did knowingly and intentionally conspire to execute a scheme and artifice to

defraud investors and potential investors in connection with securities of an issuer with a class of

securities registered under Section 12 of the Securities Exchange Act of 1934, specifically,

ForceField Energy Inc., and to obtain money and property from investors and potential investors

by means of materially false and fraudulent pretenses, representations and promises in connection

with purchases and sales of securities of issuers with a class of securities registered under Section

12 of the Securities Exchange Act of 1934, specifically, ForceField Energy Inc., contrary to Title

18, United States Code, Section 1348.

(Title 18, United States Code, Section 1349)

The source of your deponent's information and the grounds for his belief are as follows:

## INTRODUCTION

1.     I have been a Special Agent with the FBI for approximately four years.  I am currently assigned to an FBI squad which investigates securities fraud, wire fraud and other financial crimes.  During my tenure with the FBI, I have participated in numerous financial fraud investigations and have participated in all aspects of investigations, including conducting surveillance, executing search warrants, debriefing defendants and informants, interviewing witnesses, reviewing and analyzing recorded conversations and analyzing telephone toll information.  During the course of these investigations, I have served as the lead investigator in the investigation and prosecution of persons involved in securities fraud, among other crimes.

2.     I have personally participated in the investigation of securities fraud by the defendant RICHARD ST. JULIEN, among others, as discussed below.  I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) discussions with other law enforcement agents involved in this investigation, and (c) my review of trading records, telephone records, and bank records, among other sources of evidence.

3.     Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents.  Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendant, I have not set forth each and every fact learned in the course of this investigation.  Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrant sought herein.  In addition, where the

contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

## PROBABLE CAUSE

Relevant Regulatory Principles and Definitions

4.     "Small-cap" stocks refer to stocks of publicly traded U.S. companies with a relatively small market capitalization.   A small-cap company is generally a company with a market capitalization of between $300 million and $2 billion.   Small-cap stocks can be subject to price manipulation because they are thinly traded.   When large blocks of small-cap stock are controlled by a small group of individuals, it enables those in the group to control or orchestrate manipulative trading in those stocks, including creating the false appearance that there is a genuine market interest in the stock.

5.     An International Business Corporation ("IBC") is an offshore, untaxed company, formed under the laws of a foreign jurisdiction, which is not permitted to engage in business within the jurisdiction in which it is incorporated.   An owner of an IBC could deposit money and transfer stock to an IBC to facilitate banking and securities trading activities while maintaining a level of anonymity for the IBC's true owner because an IBC's ownership records are typically not publicly available.   In many training and experience, stock fraudsters often use IBCs formed in countries like Belize to perpetrate securities fraud and launder the proceeds of their illegal stock activity.

6.     The term "nominee" in the securities fraud context refers to a person or firm into whose name securities or other properties are transferred in order to facilitate transactions, while concealing the customer as the actual owner.

7.      The term "beneficial owner" is defined under the rules of the U.S.

Securities and Exchange Commission ("SEC").   It includes any person who directly or indirectly

shares voting power or investment power (the power to sell a security).   Section 16(a) of the

Securities Exchange Act of 1934 requires that, among other requirements, directors and officers of

a company file reports of ownership or changes of ownership with the SEC.   Any changes in

holdings, such as stock purchases or sales, must be reported to the SEC within two business days

of the change.

The Defendant, a Co-Conspirator and the Publicly Traded Company

8.      ForceField Energy Inc. ("ForceField"), formerly Sunsi Energies Inc.

("Sunsi"), was a publicly traded company whose common stock was listed on the NASDAQ under

the ticker symbol "FNRG."[1]   ForceField, which purported to be a worldwide distributor and

provider of LED lighting products and solutions, had a class of securities registered under Section

12 of the Securities Exchange Act of 1934.

9.      The defendant RICHARD ST. JULIEN, a Canadian citizen who resided in

Costa Rica, was the Executive Chairman of the Board of Directors of ForceField and President of

ForceField's LED Operations.   Prior to this, in 2009, ST. JULIEN was a member of Sunsi's

Board of Directors, the predecessor to ForceField, and in approximately 2011, he became the

Executive Chairman of Sunsi's Board of Directors.

10.      On or about October 13, 2013, ForceField filed a Form 8-K statement with

the SEC stating that its common stock had been approved for listing on the NASDAQ Capital

---

[1]   In or about February 2013, ForceField filed a Form 8-K statement with the SEC stating
that it had amended its articles of incorporation to change its name from Sunsi to ForceField and its
ticker symbol from "SSEI" to "FNRG."

Market, the NASDAQ equity market for small-cap companies. On or about December 23, 2013, the defendant RICHARD ST. JULIEN rang the closing bell at the NASDAQ MarketSite.

11.     The defendant RICHARD ST. JULIEN was also the beneficial owner of Adventure Overseas Holding Corp. ("Adventure Overseas"), an IBC (as defined above) located in Belize City, Belize.   ST. JULIEN is the signatory on Adventure Overseas' bank account at Belize Bank International ("BBI").

12.     One of the defendant RICHARD ST. JULIEN's co-conspirators ("CC-1"), an individual whose identity is known to your deponent, was a dermatologist who resided in Boulder, Colorado.   CC-1 was not registered as a broker and has not worked in the securities industry.   CC-1 had a brokerage account at Scottrade, Inc. (the "Scottrade brokerage account"), and a bank account at Wells Fargo (the "Wells Fargo bank account").

The Fraudulent Scheme

13.     From approximately August 2012 to April 2015, the defendant RICHARD ST. JULIEN, together with CC-1 and others, conspired to deceive the investing public and manipulate the price of Sunsi and ForceField stock in a variety of ways, including: (1) through ST. JULIEN's use of nominees to purchase and sell Sunsi and ForceField stock on his behalf without disclosure to investors and potential investors, in violation of securities laws; (2) through the use of orchestrated trading of ForceField stock that was designed to create the appearance of genuine trading volume and interest in the stock; and (3) through the use of stock promoters and broker dealers who did not disclose to potential investors that they had been paid by ST. JULIEN and others to promote the purchase of ForceField stock.[2]

---

[2]     Some of these broker dealers were located within the Eastern District of New York.

5

14.     Based on information learned in the course of this investigation, including my review of telephone records, bank records, and trading records, from approximately August 2012 to April 2015, the defendant RICHARD ST. JULIEN funded CC-1's purchase of shares of Sunsi, and then ForceField, and directed CC-1 to buy and sell the stock from CC-1's Scottrade brokerage account.   Below are some examples of the ST. JULIEN's coordination with CC-1 to manipulate the stock of Sunsi and ForceField.

15.     On or about August 20, 2012, approximately $20,000 was transferred from Sunsi's HSBC bank account, on which ST. JULIEN was one of the signatories, to Adventure Overseas' BBI bank account, which ST. JULIEN controlled.   The following day, approximately $100,000 was transferred from Adventure Overseas' BBI bank account to CC-1's Wells Fargo bank account.   Later that day, CC-1 wired $20,000 from his Wells Fargo bank account to his Scottrade brokerage account, which had a balance at the time of approximately $132.   On or about August 23, 2012, CC-1 began purchasing Sunsi stock from his Scottrade brokerage account.   My review of trading records has revealed that for the remainder of 2012 and 2013, CC-1 periodically bought and sold Sunsi and then ForceField stock in an apparent effort to create trading volume in Sunsi and ForceField using funds provided to him by ST. JULIEN.

16.     Throughout 2014, the defendant RICHARD ST. JULIEN provided additional funding to CC-1, which CC-1 then transferred into his Scottrade brokerage account to purchase ForceField stock.   ST. JULIEN was frequently in contact by telephone with CC-1 within minutes of CC-1's buying and selling of ForceField stock, further evidencing ST. JULIEN's control over CC-1's trading activity.   The following are examples of ST. JULIEN and CC-1's fraudulent coordination:

6

a.      On or about March 3, 2014, ST. JULIEN texted CC-1 at approximately 10:29 a.m.[3]   From approximately 10:29 a.m. to 10:34 a.m., CC-1 placed six orders to purchase a total of 4,000 shares of ForceField stock.   Telephone records show that at approximately 10:35 a.m., CC-1 texted ST. JULIEN.   CC-1's purchase orders of ForceField stock accounted for almost 25 percent of the trading volume that day.

b.      On or about March 11, 2014, at approximately 9:32 a.m., CC-1 placed an order to purchase ForceField stock.   At approximately 9:33 a.m. and 9:34 a.m., CC-1 and ST. JULIEN exchanged text messages.   At approximately 9:35 a.m., CC-1 placed another order to purchase ForceField stock.   In total, CC-1's purchase orders of ForceField stock accounted for approximately 21 percent of the trading volume that day.

c.      On or about March 19, 2014, from approximately 1:46 p.m. to 2:42 p.m., CC-1 placed six orders to buy or sell ForceField stock.   At approximately 2:51 p.m., CC-1 texted ST. JULIEN.   From approximately 3:03 p.m. to 3:57 p.m., CC-1 placed three additional orders regarding ForceField stock.   At approximately 4:00 p.m., CC-1 texted ST. JULIEN. From approximately March 3, 2014 to March 19, 2014, the price of ForceField stock began at $5.00 per share, dropped to $4.55 per share, and ultimately increased to $6.18 per share, aided in part by ST. JULIEN and CC-1's manipulative and undisclosed trading.

d.      On or about June 3, 2014, $25,000 was wired from Adventure Overseas' BBI bank account to CC-1's Wells Fargo bank account.   On that day, at approximately 9:35 a.m., CC-1 received a text message from ST. JULIEN.   Between approximately 9:51 a.m. and 10:05 a.m. that day, CC-1 placed four purchase orders of ForceField stock.   At approximately

---

[3]      All times set forth herein are in Eastern Standard Time.

10:06 a.m., CC-1 texted ST. JULIEN.   Later that day, CC-1 placed four additional trade orders

regarding ForceField stock and had five additional text exchanges with ST. JULIEN.

> e.        On or about June 6, 2014, CC-1 wired approximately $25,000 from
>
> his Wells Fargo bank account to his Scottrade brokerage account, which had a balance of
>
> approximately -$37,000 at that time.[4]    Between approximately 2:34 p.m. and 3:49 p.m., CC-1
>
> and ST. JULIEN exchanged approximately eight text messages.   At approximately 3:49 p.m.,
>
> CC-1 placed two purchase orders of ForceField stock.   From approximately 3:51 p.m. to 3:58
>
> p.m., CC-1 and ST. JULIEN exchanged approximately four text messages.   At approximately
>
> 3:58 p.m. and 3:59 p.m., CC-1 placed two more purchase orders for ForceField stock.   Between
>
> approximately 3:59 p.m. and 11:15 p.m., CC-1 and ST. JULIEN exchanged approximately 11 text
>
> messages.
>
> f.        On or about June 13, 2014, approximately $25,000 was wired from
>
> ForceField's HSBC bank account, on which ST. JULIEN was one of the signatories, to Adventure
>
> Overseas' BBI bank account.   On or about June 16, 2014, approximately $25,000 was wired from
>
> Adventure Overseas' BBI bank account to CC-1's Wells Fargo bank account.   On or about June
>
> 17, 2014, CC-1 wired approximately $25,000 from his Wells Fargo bank account to his Scottrade
>
> brokerage account, which had a balance of approximately -$47,000 at that time.   On that day, at
>
> approximately 9:56 a.m. and 10:12 a.m., ST. JULIEN and CC-1 exchanged two text messages.
>
> At approximately 10:12 a.m., CC-1 placed an order to purchase ForceField stock.   CC-1 placed
>
> two more purchase orders of ForceField stock between approximately 12:23 p.m. and 12:24 p.m.,

---

[4]  CC-1's Scottrade brokerage account was a margin account.   A margin account is a
brokerage account in which the broker lends the customer cash to purchase securities.   The loan in
a margin account is collateralized by the securities and cash.

and then exchanged approximately six text messages from approximately 12:25 p.m. to 8:46 p.m. with ST. JULIEN.

         g.     On or about June 27, 2014, CC-1 wired approximately $25,000 from his Wells Fargo bank account to his Scottrade brokerage account, which had a balance of approximately -$42,000 at that time. Later that day, CC-1 placed one purchase order of ForceField stock at approximately 3:59 p.m. At approximately 4:11 p.m., CC-1 exchanged two text messages with ST. JULIEN. On or about June 30, 2014, approximately $24,975 was wired from ST. JULIEN's BAC San Jose bank account to CC-1's Wells Fargo bank account.

         h.     On or about September 26, 2014, approximately $15,000 was transferred from Adventures Overseas' BBI bank account to CC-1's Wells Fargo bank account. The wire detail for this transaction was "Advance on Purchase of Shares." On or about September 29, 2014, CC-1 transferred approximately $15,000 to his Scottrade brokerage account. Trading and telephone records show that ST JULIEN continued to direct CC-1's trading of ForceField stock.

        17.     The defendant RICHARD ST. JULIEN's funding of CC-1's repeated and significant purchases of ForceField shares and the control he exercised over CC-1's trading activity in ForceField were not disclosed to investors and potential investors.

        18.     Additionally, wire transfer records show that, on or about January 27, 2015, CC-1 wired approximately $50,000 to a corrupt stock promoter ("CC-2"). On or about January 30, 2015, CC-2, through his stock promotion company, began promoting the purchase of ForceField stock on the company's publicly available Facebook page. Notably, the disclaimer on the Facebook page stated, in sum and substance, that CC-2 was being compensated approximately

$25,000 – not $50,000 – to promote ForceField's stock by a corporate entity that is not associated with CC-1.

19.    Based on the actions of the defendant RICHARD ST. JULIEN and his co-conspirators, from approximately January 1, 2014 to April 10, 2015, the price of ForceField's stock rose from a low of $4.55 per share to $7.82 per share, an increase of approximately 42 percent.   In my training and experience, corporate executives such as ST. JULIEN engage in the kinds of activities set forth herein -- the use of nominees, manipulative stock trading and corrupt stock promoters -- to hide their beneficial ownership of the company's stock and manipulate the price of the stock to defraud the investing public and profit from the money generated from investors' purchase of stock, all in violation of securities laws.

## CONCLUSION

WHEREFORE, based on the foregoing, your deponent respectfully requests that an arrest warrant be issued for the defendant RICHARD ST. JULIEN so that he may be dealt with according to law.

Because public filing of this document could result in a risk of flight by the defendant RICHARD ST. JULIEN, as well as jeopardize the government's ongoing investigation, your deponent respectfully requests that this complaint, as well as any arrest warrant issued in connection with this complaint, be filed under seal.

Dated:   Brooklyn, New York
         April 17, 2015

ARISTOTELIS KOUGEMITROS
Special Agent, FBI

Sworn to before me this
17th day of April, 2015

THE HONORABLE MARILYN D. GO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

11